**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1830**

RICHARD FLETCHER; JOANN FLETCHER,

Plaintiffs - Appellants,

v.

MARYLAND TRANSIT ADMINISTRATION, MTA; MARYLAND DEPARTMENT OF TRANSPORTATION; PETE RAHN, Maryland Transportation Secretary, individually and in his official capacity; MARYLAND STATE DEPARTMENT OF EDUCATION; H. LEON LANGLEY, Director of Pupil Transportation Office, individually and in his official capacity; STATE OF MARYLAND; BALTIMORE COMMUNITY HIGH SCHOOL; BALTIMORE CITY PUBLIC SCHOOLS; GREGORY THORTON, CEO, Baltimore City Public Schools, individually and in his official capacity; BALTIMORE CITY BOARD OF SCHOOL COMMISSIONERS; BALTIMORE COMMUNITY HIGH SCHOOL POLICE; CITY OF BALTIMORE,

Defendants - Appellees,

and

KEENAN T. HOLLOWAY; SAMTOYA I. WILLIAMS; ANTOINE W. LAWSON; G.L.B., JR., a minor by his parent and natural guardian Zaneta V. Thomas; Y.W., a minor by his parent and natural guardian Yolanda E. Wheatley; M.L.S., a minor by her parent and natural guardian Kim E. Stewart; A.O.A., a minor by his parent and natural guardian Esparanza Gayles,

Defendants.

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, Senior District Judge. (1:17-cv-00003-JFM)

Argued: May 9, 2018

Decided: July 10, 2018

Before KING, DIAZ, and FLOYD, Circuit Judges.

Affirmed by unpublished opinion. Judge Diaz wrote the opinion, in which Judge King and Judge Floyd joined.

**ARGUED:** Cary Johnson Hansel, III, HANSEL LAW, P.C., Baltimore, Maryland, for Appellants. Amanda Lee Costley, BALTIMORE CITY PUBLIC SCHOOLS, Baltimore, Maryland; Alan John Dunklow, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Annie P. Kaplan, LAW OFFICES OF ANNIE KAPLAN CHTD, Washington, D.C., for Appellants. Brian E. Frosh, Attorney General, Julie T. Sweeney, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, for Appellees Maryland Transit Administration and Secretary Pete Rahn. Andre M. Davis, City Solicitor, Robert D. Anbinder, Chief Solicitor, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees Mayor and City Council of Baltimore. Tamal A. Banton, Senior Counsel, Office of Legal Counsel, BALTIMORE CITY PUBLIC SCHOOLS, Baltimore, Maryland, for Appellees Baltimore City Public Schools, Baltimore Community High Schools, Baltimore Community High School Police, Baltimore City Board of School Commissioners, and Dr. Gregory Thornton.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

On the afternoon of April 22, 2015, a group of high school students brutally attacked Richard Fletcher outside his home. The students had just been released from school and were walking, unsupervised, to their bus stop. Fletcher and his wife brought suit against the assailants, as well as various Maryland State and Baltimore City agencies and officials. They allege that the government defendants were negligent and deliberately indifferent to their safety, creating a dangerous situation that resulted in the near-fatal assault on Fletcher.

But the district court dismissed all claims against the government defendants. The court reasoned that these defendants were under no special duty to protect the Fletchers, and that their duty to the public at large isn't enforceable in tort. The Fletchers appeal. Despite the unfortunate facts of this case, we must affirm.

I.

Community High School is an alternative school located just down the street from the Fletchers' home in Baltimore City. Some of its students have criminal records and others have "past violent behavioral problems" that preclude them from attending a regular high school. Compl. ¶ 28. The school doesn't operate standard school buses, so many of its students rely on the public bus system. When Community High first opened, the Maryland Transportation Administration ("MTA") operated a route that stopped at the school. However, sometime prior to the attack on Fletcher, the MTA rerouted its bus so that it no longer stopped at the school. As a result, students had to walk through the Fletchers' neighborhood to reach another MTA bus stop several blocks away.

3

Local residents complained to the school about the students' behavior as they crossed through the neighborhood, reporting incidents of harassment, threats, and property damage. Residents also requested that the MTA reinstate the school bus stop, to no avail. At some point, Community High monitored its students as they walked through the Fletchers' neighborhood, but it eventually discontinued that practice. The school refused to reinstate any form of supervision despite numerous complaints of hostile encounters between its students and neighborhood residents.

On April 22, 2015, Fletcher and his wife were at home when Fletcher heard a commotion and stepped outside to investigate. He saw a group of students surrounding and climbing on his cars parked across the street and two young women fighting. Fletcher approached the melee and asked the women to stop fighting and the students to get down off his cars. In response, seven of the students attacked him. They repeatedly struck and kicked him, even as he fell to the ground.

The attack ended only when police arrived. By then, Fletcher was severely and permanently injured. He endured a lengthy hospitalization, including a period in an induced coma, and underwent multiple surgeries. He suffered brain damage, memory loss, disfigurement, pain and suffering, and post-traumatic stress disorder.

Fletcher and his wife filed suit against seven students, as well as numerous Maryland State and Baltimore City agencies and officials that manage education or transportation services, including the MTA and Community High School. Against the government defendants, the Fletchers brought negligence claims and § 1983 substantive due process claims. The Fletchers allege that the government defendants were negligent

4

and reckless in rerouting the MTA bus, failing to provide students with adequate transportation, and refusing to reinstate the monitoring program or otherwise supervise students walking through the Fletchers' neighborhood. Under 42 U.S.C. § 1983, the Fletchers allege that the government defendants denied Fletcher his constitutional due process rights under the Fifth and Fourteenth Amendments because their deliberate indifference to his neighborhood's safety created a dangerous situation that resulted in the attack.[1]

The Fletchers sued in the Circuit Court for Baltimore County, but the defendants removed the case to federal court. The government defendants then moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims against them. The district court granted their motions to dismiss on the sole basis that these defendants owed no enforceable duty to the Fletchers. The court's analysis was brief but pointed:

> As a general rule, a defendant is under no special duty to protect another from acts by a third person, in the absence of statutes, or of a special relationship. Moreover, when a statute or common law imposes upon a public entity a duty to the public at large the duty is not one enforceable in tort. This includes the duty owed by the police by virtue of their positions as officers. This is particularly true here since Mr. Fletcher left the safety of his home to confront the students.

*Fletcher v. Holloway*, No. –JFM-17-3, 2017 WL 1497836, at *2 (D. Md. Apr. 26, 2017) (internal quotation marks, citations, and ellipses omitted). The district court remanded the Fletchers' remaining claims (against the student assailants) to state court.

---

[1] The complaint also alleges that the defendants violated Fletcher's rights under Articles 2 and 24 of the Maryland Constitution.

5

The Fletchers appeal the district court's dismissal of their claims against the government defendants. They argue that the district court erred because there exist special relationships—both between the defendants and the students and between the defendants and the Fletchers—that give rise to an enforceable duty to act, and the defendants created the dangerous situation that led to Fletcher's injuries.

II.

We review de novo a district court's grant of a motion to dismiss under Rule 12(b)(6). *Lambeth v. Bd. of. Comm'rs*, 407 F.3d 266, 268 (4th Cir. 2005). To survive a motion to dismiss, plaintiffs must state "enough facts to state a claim to relief that is plausible on its face." *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009). Although the district court dismissed all claims against the government defendants in one fell swoop, we analyze the negligence claims and the § 1983 due process claims separately.

A.

To plead negligence in Maryland, a plaintiff must "allege with certainty and definiteness, facts and circumstances sufficient to set forth (a) a *duty* owed by the defendant to the plaintiff, (b) a *breach* of that duty and (c) injury *proximately* resulting from that breach." *Pace v. State*, 38 A.3d 418, 423 (Md. 2012). The existence of a duty is a matter of law that a court may dispose of on a motion to dismiss. *Id.*

6

To determine if a duty exists, Maryland state courts consider "the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties." *Id.* at 424. They also consider:

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Remsburg v. Montgomery*, 831 A.2d 18, 26 (Md. 2003).

However, "there is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection." *Lamb v. Hopkins*, 492 A.2d 1297, 1300 (Md. 1985) (quoting Restatement (Second) of Torts § 315 (1965)).

Relatedly, under the public duty doctrine, "when a statute or common law imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort." *Muthukumarana v. Montgomery Cty.*, 805 A.2d 372, 395 (Md. 2002) (internal quotation marks omitted). The public duty doctrine doesn't apply when a public entity has "a special duty or specific obligation to a particular class of persons rather than to the public at large." *Id.* at 396 (emphasis and internal quotation marks omitted).

The Fletchers' complaint alleges that the defendants were negligent when they rerouted the MTA bus, failed to provide students with adequate transportation, and refused to monitor students as they crossed through the Fletchers' neighborhood. The district court dismissed these claims because there was no special relationship giving rise to a duty, and the government defendants' duty to the public at large isn't enforceable under the public duty doctrine. Whether the defendants owed an enforceable duty depends on whether they had a special relationship with the students or with local neighborhood residents like the Fletchers.[2] We turn now to those questions.

1. *Special Relationship Between Defendants and Students*

The Fletchers claim that the government defendants had an enforceable duty to control the student assailants because they were in charge of the students and the students had a known propensity for violence. We disagree.

---

[2] Apart from their main argument, the Fletchers claim this is a case of first impression because the public duty doctrine is usually applied in the context of tort claims against law enforcement officers—not policymakers. They argue that courts have relied on rationales that are specific to law enforcement contexts and don't apply with equal force to policymakers who are not subject to the "demanding circumstances involved in emergency services" where every decision is "fraught with uncertainty." *Muthukumarana*, 805 A.2d at 398.

But the public duty doctrine isn't limited to law enforcement. Rather, it is an application of the general principle that one doesn't have an affirmative duty to prevent third parties from injuring others absent a special relationship. *See id.* at 396. And Maryland courts have repeatedly applied the public duty doctrine outside of the law enforcement context. *See Pulliam v. Motor Vehicle Admin.*, 955 A.2d 843, 868 (Md. 2008) (dismissing tort claims against the Motor Vehicle Administration and Medical Advisory Board); *Willow Tree Learning Ctr. v. Prince George's Cty.*, 584 A.2d 157, 164 (Md. 1991) (county safety inspector); *Pace v. State*, 38 A.3d 418, 432–33 (Md. 2012) (Department of Education and state Superintendent of Schools).

8

Under Maryland law, "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." *Lamb*, 492 A.2d at 1301 (quoting Restatement (Second) of Torts § 319). "[A]n actor typically takes charge of a third person by placing him in some form of custody." *Id.* at 1302. This includes, for example, a correctional institution incarcerating a dangerous criminal or a mental institution confining a dangerous patient. *Id.*

This case, of course, doesn't involve dangerous prisoners or patients, but rather students who attend an alternative high school. Even assuming that the defendants knew the students were likely to injure others if not controlled, the defendants weren't in charge of the students at the time of the attack. It's possible that a school has a duty to control its students with known violent propensities while the students are at school. *See, e.g.*, *Thomas v. City Lights Sch., Inc.*, 124 F. Supp. 2d 707, 713 (D.D.C. 2000) (holding school for at-risk youth owed duty under § 319 to supervise its students while on a school field trip). But in this case, the students attacked Fletcher beyond the school boundaries and after school hours. In short, they were no longer in the school's custody or control. *See Beshears v. Unified Sch. Dist. No. 305*, 930 P.2d 1376, 1384–85 (Kan. 1997) (holding school district had no duty under § 319 to protect a student from an afterschool, off-premises fight with another student); *Pratt v. Robinson*, 349 N.E.2d 849, 852 (N.Y. 1976) (holding that a school's custodial duty toward a child ceases when "the child has passed out of the orbit of its authority in such a way that the parent is perfectly free to reassume control over the child").

9

2.      *Special Relationship Between Defendants and Neighborhood Residents*

Next, the Fletchers claim that a special relationship exists between the government defendants and the neighborhood residents because the defendants undertook to render services to protect them but then didn't exercise reasonable care. Again, we disagree.

In support of their claim, the Fletchers rely on § 323 of the Restatement (Second) of Torts, which states:

> One who undertakes . . . to render services to another . . . is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Maryland courts haven't expressly adopted § 323 of the Restatement. Instead, they apply a more general standard: a special relationship exists when "the local government . . . affirmatively act[s] to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance." *Ashburn v. Anne Arundel Cty.*, 510 A.2d 1078, 1085 (Md. 1986).

Under either standard, the government defendants never formed a special relationship with neighborhood residents like the Fletchers. The defendants did, at some point, monitor students crossing through the neighborhood. But the Fletchers never allege that they relied on the temporary monitoring program to their detriment. An actor who gratuitously aids another may "abandon his efforts at any time unless, by giving the aid, he has put the other in a worse position than he was in before the actor attempted to aid him." Restatement (Second) of Torts § 323 cmt. c. When the school ended the monitoring

10

program, the Fletchers were no worse off than they were before the monitoring program began.

Because there was no special relationship giving rise to an enforceable duty, the district court was right to dismiss the Fletchers' negligence claims against the government defendants.

B.

The Fletchers' § 1983 claims allege that the government defendants deprived Fletcher of his liberty without due process of law, in violation of his Fifth and Fourteenth Amendment rights, by failing to protect him against the student assailants. The Fletchers claim the defendants were deliberately indifferent to the neighborhood's safety and created the dangerous situation. The district court dismissed these claims for the same reason it dismissed the negligence claims: the defendants owed no affirmative duty to protect the Fletchers.

"[T]he Supreme Court has established a strong presumption that § 1983 due process claims which overlap state tort law should be rejected and the case, if diversity is lacking, sent to state court." *Waybright v. Frederick Cty*, 528 F.3d 199, 205 (4th Cir. 2008). The presumption can only be overcome by "showing governmental conduct so arbitrary and egregious that it shocks the conscience, usually because a state actor intended harm without justification." *Id.* (internal quotation marks omitted); *see also Collins v. City of Harker Heights*, 503 U.S. 115, 128–29 (1992) ("[W]e have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law.").

11

Generally, "the Due Process Clause of the Fourteenth Amendment does not require governmental actors to affirmatively protect life, liberty, or property against intrusion by private third parties." *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995) (en banc). The Supreme Court, in *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, explained:

> If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

489 U.S. 189, 196–97 (1989).

The *DeShaney* court did recognize that the state may have an affirmative duty to protect when it restrains a person's liberty such that he is unable to care for himself. *Id.* at 199–200. But we've interpreted this to mean an affirmative duty may arise in a "custodial context." *Pinder*, 54 F.3d at 1175. As previously discussed, none of the defendants in this case had control, much less custody, over the student assailants at the time of the attack.

The Fletchers argue that the government defendants created the dangerous situation that led to Fletcher's injuries. It's true that state actors are not immune from liability when "they themselves throw others to the lions." *Id.* at 1177. When "the state itself creates the dangerous situation that resulted in a victim's injury . . . the state is not merely accused of a failure to act; it becomes much more akin to the actor itself directly causing harm to the injured party." *Id.* But "to establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." *Doe v.*

12

*Rosa*, 795 F.3d 429, 439 (4th Cir. 2015). "It cannot be that the state 'commits an affirmative act' or 'creates a danger' every time it does anything that makes injury at the hands of a third party more likely. If so, the state would be liable for every crime committed by the prisoners it released." *Pinder*, 54 F.3d at 1175.

Here, the government defendants did not act affirmatively to create a danger. Instead, the students were a pre-existing danger. The cases are clear that "allowing continued exposure to an existing danger by failing to intervene is not the equivalent of creating or increasing the risk of that danger." *Doe*, 795 F.3d at 439; *see also Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1263 (10th Cir. 1998) (concluding state actor not liable for pre-existing danger "even if the state put the plaintiff back in that same danger").

The closest thing to an affirmative act the Fletchers can point to is the MTA's decision to reroute the public bus. But that decision didn't directly harm them; the causal chain of events is far too attenuated. The "concept of affirmative acts should not extend beyond the context of immediate interactions between the state actor and the plaintiff." *Doe*, 795 F.3d at 441 (internal quotation marks omitted). Furthermore, even if the state caused the students to walk through the Fletchers' neighborhood, it was Fletcher who left his home and approached the students on the street.

We have refused to apply the state-created danger doctrine in cases where there's a much closer nexus between the state action and a plaintiff's injuries. For example, in *Pinder v. Johnson*, Pinder's ex-boyfriend broke into her home, assaulted her, and threatened to kill her and her three children. Pinder called the police and when Officer Johnson arrived, she fully informed him of the situation. Officer Johnson assured Pinder

13

that she could safely leave her children at home alone while she went to work that evening because he was going to bring assault charges and the ex-boyfriend would be in jail throughout the night. But Johnson instead charged the ex-boyfriend with misdemeanor offenses and released him on his own recognizance. While Pinder was at work, the ex-boyfriend returned to her house and set it on fire, killing her three children who were asleep inside. *See Pinder*, 54 F.3d at 1172. Despite the police officer's conduct, we found no state-created danger, reasoning that "[n]o amount of semantics can disguise the fact that the real 'affirmative act' here was committed by [the ex-boyfriend], not by Officer Johnson." *Id.* at 1175.

While the state-created danger doctrine can be difficult to apply at the margins, the facts of this case (tragic as they are) don't present such a challenge. The government defendants didn't create a danger; at most, they simply failed to act in response to a danger. That's not enough to impose liability.[3]

III.

For the reasons given, we are constrained to affirm the district court's judgment.

*AFFIRMED*

---

[3] The Fletchers also allege that the government defendants violated their rights under the Maryland Constitution. Maryland courts haven't adopted the state-created danger theory as a basis upon which to recover for violations of Maryland's constitution, but even if the doctrine did apply, the government defendants didn't act "sufficiently affirmatively" toward the Fletchers. *See McNack v. State*, 920 A.2d 1097, 1105–06 (Md. 2007).